IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs June 28, 2005

## STATE OF TENNESSEE v. BURN HARRIS DOCKERY, JR.

**Direct Appeal from the Criminal Court for Cocke County**
**No. 9195    Ben W. Hooper, II, Judge**

---

**No. E2004-02094-CCA-R3-CD - July 28, 2005**

---

A jury convicted the Defendant, Burn Harris Dockery, Jr., of reckless aggravated assault, a class D felony. The trial court sentenced the Defendant to three years, as a Range I standard offender, and it ordered that the Defendant serve sixty days in the county jail and the additional two years and ten months on probation. On appeal, the Defendant contends that: (1) the evidence is insufficient to sustain his conviction; and (2) the trial court improperly sentenced him. Finding no error in the judgment of the trial court, we affirm the Defendant's conviction and sentence.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR. and ALAN E. GLENN, JJ., joined.

Keith E. Haas, Newport, Tennessee, for the appellant, Burn Harris Dockery, Jr.

Paul G. Summers, Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; Al C. Schmutzer, Jr., District Attorney General; and James B. Dunn, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
### I. Facts

In November 2003, the Cocke County Grand Jury indicted the Defendant on one count of aggravated assault. On February 18, 2004, at the Defendant's jury trial, the following evidence was presented: Timothy James Ogle testified that he had known the Defendant for around six months because he did mechanical work on the Defendant's cars. He said that, on September 17, 2004, he was working on two of the Defendant's cars. He recalled that, on that day, the Defendant called him regarding a car part that the Defendant needed. Ogle testified that he went to the Defendant's house and drove the Defendant into "town," then he gave the Defendant a ride home at around noon. He said that, at that point, the Defendant gave him $100.00 to obtain a gas tank unit for a 1963 Impala. Ogle recalled that he was unable to locate the part, and he returned the money to the Defendant, less

a $10.00 surcharge for his time and gas used looking for the part. He testified that the Defendant was upset with him because he had been "gone a while," and the Defendant began cursing at him. He recalled that he was sitting on the sofa in the living room when the Defendant began to curse at him. Ogle stated that the Defendant then began choking him, and he struggled but eventually got free of the Defendant. He said that he went to the door to leave, but he had to stop to unlock it, and, at that point, the Defendant hit him in the back of the head. Ogle testified that the Defendant had a knife, and the Defendant began stabbing at Ogle's head with the knife. He said that the Defendant stabbed him four times on the top right side of his head, and he said that one of the resulting cuts required staples. He said that the Defendant stabbed him once in the right side of his body, piercing his liver. Ogle also identified the clothes and hat that he was wearing at the time of the incident, and he noted a cut on the hat and a cut and blood stains on the shirt. He recalled that, during the incident, he noticed a woman sitting on a man's lap in the back of the house, but he said that he did not know them. He said that the Defendant never asked him to leave the house. Ogle recalled that, after leaving the Defendant's house, he drove to the police station, where an ambulance was called. He said that he was airlifted to the Johnson City Medical Center, where he remained until 5:00 or 6:00 p.m. that evening.

On cross-examination, Ogle testified that he looked for the car part for around four hours before returning to the Defendant's house. He said that he entered the house and gave the Defendant $90.00, which was $10.00 less than the Defendant had given him earlier that day. Ogle recalled that he sat down on the couch, and he said that a man and woman were in the room with the Defendant and him. He reiterated that, after the Defendant began beating on him, he tried to leave. Ogle recalled that he fell into a rocking chair next to the door and attempted to block the Defendant's attack. He denied ever hitting or kicking the Defendant.

Shirley Ogle, the victim's mother, testified that her son lives with her. She said that her son received a phone call, or made a phone call, at around 1:00 p.m., on September 17, regarding a car part. She recalled that her son left the house at around 3:00 p.m. to go to the pawn shop. She said that, while he was gone, she received a phone call from a man who identified himself as "Burn." Mrs. Ogle testified that the caller was very angry and threatened her son, stating, "I'm going to kill the son-of-a-B[****]." On cross-examination, Mrs. Ogle testified that she did not have caller-id, and she did not use star-69 to identify the caller who threatened her son. She said that she did not call the police to report the threat.

Robert Caldwell, Chief Detective at the Cocke County Sheriff's Department, testified that he investigated this case. He said that, on September 17, 2003, he spoke to Ogle at the emergency room, and he took Ogle's statement. He recalled that, a few days later, he took a second statement from Ogle, which Ogle signed. After receiving Ogle's statement at the hospital, the detective went to the Defendant's house, and he asked the Defendant to come to the detective's office for questioning, which the Defendant did. Detective Caldwell testified that the Defendant gave him a statement, and he read that statement into evidence. In that statement, the Defendant explained that he gave Ogle $100.00 to purchase a part for his car, and he called Ogle's house several times regarding Ogle's whereabouts. The Defendant's statement also explained that he asked Ogle to leave

the house five or six times, and the Defendant admitted that, he grabbed Ogle by the neck to make him leave. The statement further acknowledged that the Defendant tried to pick Ogle up, and Ogle began to kick him, at which time the Defendant took out his knife and began "picking" at Ogle. The Defendant's statement explained that two other people, Randy Massey and Angie Wood, were present during the incident. Detective Caldwell testified that the Defendant signed his statement and voluntarily gave the knife to the detective.

On cross-examination, Detective Caldwell testified that he charged the Defendant immediately after taking the Defendant's statement. The detective said that he did not speak to the two witnesses, Wood and Massey, until a few weeks before trial, because he had difficulty locating them. He admitted that both witnesses told him that the Defendant asked Ogle to leave his home several times on September 17, 2003. The detective said that he never went inside the Defendant's home.

Angie Wood Green testified that, in September of 2003, she lived with her boyfriend, Randy Massey. She recalled that, on September 17, 2003, she went with Massey to the Defendant's house because Massey was helping the Defendant work on a car. She did not know what time they arrived, but she said that she and Massey were at the Defendant's house for about an hour and a half before Ogle arrived. She testified that she did not know Ogle, and she had never seen him before that day. Green explained that she had known the Defendant for around two years. While at the Defendant's house that day, she never saw the Defendant use the telephone. Green said that she was sitting in a chair next to the couch and across from the front door and a rocking chair that was next to the front door. She explained that, when Ogle entered the house, he sat on the couch between Massey and the Defendant. Green testified that the Defendant asked Ogle to leave several times. Green stated that the Defendant's door was "usually always unlocked." She explained that, when the Defendant and Ogle began to fight, Massey stood up in front of her. She testified that, through Massey's legs, she saw the Defendant and Ogle when they were near the glide rocker and the front door. She said that she saw Ogle kicking the Defendant. She denied ever seeing the Defendant with a knife, but she recalled that there was some blood on the door and on the carpet near the door after Ogle left the house. On cross-examination, Green admitted that she drank one beer while she was at the Defendant's house that day. She denied ever seeing Ogle give the Defendant any money.

Randy Massey testified that, on September 16, 2003, he and Green went to the Defendant's house because he was going to help replace a gas tank float on the Defendant's son's car. He said that he arrived at the Defendant's house at around 12:30 or 1:00 p.m. Massey recalled that Ogle arrived at the Defendant's house, entered through the unlocked door without knocking, and sat down on the couch. He said that, after Ogle was there for ten minutes or less, the Defendant began asking Ogle to leave, and the Defendant asked Ogle to leave four or five times. Massey testified that, when the Defendant and Ogle began to fight, he stood in front of Green to protect her. He recalled that he turned around at one point, and he saw Ogle kick the Defendant. Massey explained that when he again turned around, Ogle was gone, and he noticed some blood on the door and the carpet next to the door. On cross-examination, Massey explained that he stood in front of Green, with his back to the Defendant and Ogle. He guessed he was about ten feet away from the fight where it took place.

He said that he turned twice to see what was going on. The first time, he saw Ogle kick the Defendant, and, the second time, Ogle had left. He denied ever seeing the Defendant with a knife.

The Defendant testified that he had known Ogle for at least three years. He said that, on September 17, 2003, Ogle gave him a ride into town and back, and then Ogle began pressuring him about helping to locate the car part. The Defendant explained that he gave in, and he gave Ogle $100.00 to get the car part. He recalled that Massey and Green came to his home at around 1:00 p.m. The Defendant said that he called Ogle's home trying to locate him approximately three times, but he denied ever threatening Ogle. He said that, when Ogle arrived, Ogle let himself in through the unlocked door. He said that the door was locked after Ogle entered the house. He testified that Ogle gave him $80.00, and Ogle did not have the car part. He said Ogle sat between he and Massey on the couch. The Defendant recalled asking Ogle to leave his house five or six times, but Ogle did not leave. The Defendant explained that there was nothing preventing Ogle from leaving.

The Defendant explained that, when Ogle did not leave, he stated, "Mother f[*****], I will show you how to leave." The Defendant said that he "grabbed [Ogle] by the neck [and] led him to the door." He explained that Ogle fell to the floor, through the rocking chair next to the front door, and Ogle began kicking him. He said that he is a diabetic, so he took out his knife and began "pecking him in the head." The Defendant said that he was not scared of Ogle, but he "feared for his life" because his kids were on their way home, and he did not want them to witness the incident. The Defendant said that, when Ogle left, there was blood on the door and floor. Further, the Defendant testified that the statement he gave to Detective Caldwell was true.

On cross-examination, the Defendant testified that Ogle was working on two cars for him, and that was the first work that Ogle had done for him. The Defendant stated, "I never said that I was scared of . . . Ogle. I feared for my life. A man has a right to protect his home." The Defendant testified that Ogle fell to the floor before the Defendant took out his knife.

Following this evidence, the trial court submitted the case to the jury, and the jury found the Defendant guilty of the lesser included charge of reckless aggravated assault, a class D felony, and imposed a fine of $3500. At the Defendant's sentencing hearing, on April 20, 2004, the State submitted the Defendant's presentence report, but no further evidence was introduced. In sentencing the Defendant, the trial court found that the Defendant had two prior criminal misdemeanor convictions, for theft under $500 and assault. The trial court applied the catch-all mitigating factor, explaining, however, that it placed little weight on the fact that the incident occurred inside the Defendant's home, because Ogle had apparently been welcome before the altercation began. Additionally, the trial court stated, "This was . . . It was something that didn't really have to happen, [Defendant]. There's better ways to do things than either . . . [w]ell, other than assaulting somebody with a deadly weapon, a knife. He was assaulted. He was injured, and I think it could be said was seriously injured." The trial court subsequently sentenced the Defendant to three years, as a Range I offender at thirty percent. The trial court ordered that the Defendant serve sixty days in jail, with the additional two years and ten months to be served on probation.

## II. Analysis

On appeal, the Defendant contends that: (1) the evidence is insufficient to sustain his conviction; and (2) the trial court improperly sentenced him.

### A. Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to sustain his conviction for reckless aggravated assault and that the State failed to negate the Defendant's affirmative defenses, self-defense and defense of property, beyond a reasonable doubt. The State counters that the evidence is sufficient to sustain the Defendant's conviction, and we agree.

When an accused challenges the sufficiency of the evidence, an appellate court's standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 324 (1979); State v. Carter, 121 S.W.3d 579, 588 (Tenn. 2003); State v. Smith, 24 S.W.3d 274, 278 (Tenn. 2000). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). This Court may not substitute its inferences for those drawn by the trier of fact from the evidence. State v. Buggs, 995 S.W.2d 102, 105 (Tenn. 1999); Liakas v. State, 286 S.W.2d 856, 859 (Tenn. 1956). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. Liakas, 286 S.W.2d at 859. This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. Id.; see State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000).

A person commits reckless aggravated assault who "[r]ecklessly causes an assault as defined in § 39-13-101 (a)(1), and: (A) Causes serious bodily injury to another; or (B) Uses or displays a deadly weapon." Tenn. Code Ann. § 39-13-102 (a)(2) (2003); see § 39-13-101(a)(1) (defining assault as "intentionally, knowingly or recklessly causes bodily injury to another."). In this context, the term "reckless":

> refers to a person who acts recklessly with respect to circumstances surrounding the conduct or the result of the conduct when the person is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the

result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint.

Tenn. Code Ann. § 39-11-302(c).

Tennessee's self-defense statute, Tennessee Code Annotated section 39-11-611(a) (2003), provides as follows:

> (a) A person is justified in threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force. The person must have a reasonable belief that there is an imminent danger of death or serious bodily injury. The danger creating the belief of imminent death or serious bodily injury must be real, or honestly believed to be real at the time, and must be founded upon reasonable grounds. There is no duty to retreat before a person threatens or uses force.

Additionally, "[a] person in lawful possession of real or personal property is justified in threatening or using force against another when and to the degree it is reasonably believed the force is immediately necessary to prevent or terminate the other's trespass on the land or unlawful interference with the property." Tenn. Code Ann. § 39-11-614(a). The State has the burden of negating any defense if admissible evidence is introduced supporting the defense. Tenn. Code Ann. § 39-11-201(a)(3) (2003). It is well-settled that whether an individual acted in self-defense is a factual determination to be made by the jury as the sole trier of fact. State v. Ivy, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993). It is within the prerogative of the jury to reject a claim of self-defense. State v. Goode, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997).

Viewed in a light most favorable to the State, the evidence showed that the victim did not enter the Defendant's home forcibly or without permission. The Defendant was, in fact, upset because the victim was late in arriving at his home. The evidence showed that the Defendant became angry with the victim, took out his knife, and stabbed the victim several times. The Defendant admitted that he was not scared of the victim, but only wished to "protect his home" and feared that his children would witness the incident. The jury considered the Defendant's affirmative defenses, and it rejected these defenses, as is within its province. This Court does not second-guess the weight, value, or credibility afforded to the evidence by the jury. We conclude that the evidence is sufficient to sustain the Defendant's conviction for reckless aggravated assault.

### B. Sentencing

The Defendant next contends that the trial court improperly sentenced him. The Defendant asserts that the trial court erred because: (1) it failed to grant him full probation; and (2) it enhanced his sentence in violation of the Supreme Court mandate in Blakely v. Washington, 542 U.S. 296

(2004). The State counters that the trial court did not err when it sentenced the Defendant, and we agree.

When a defendant challenges the length, range or the manner of service of a sentence, it is the duty of this Court to conduct a de novo review of the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d) (2003). This presumption is "'conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances.'" State v. Ross, 49 S.W.3d 833, 847 (Tenn. 2001) (quoting State v. Pettus, 986 S.W.2d 540, 543 (Tenn. 1999)); State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The presumption does not apply to the legal conclusions reached by the trial court in sentencing a defendant or to the determinations made by the trial court which are predicated upon uncontroverted facts. State v. Dean, 76 S.W.3d 352, 377 (Tenn. Crim. App. 2001); State v. Butler, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); State v. Smith 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994). In conducting a de novo review of a sentence, we must consider: (a) any evidence received at the trial and/or sentencing hearing; (b) the presentence report; (c) the principles of sentencing; (d) the arguments of counsel relative to sentencing alternatives; (e) the nature and characteristics of the offense; (f) any mitigating or statutory enhancement factors; (g) any statements made by the defendant on his or her own behalf; and (h) the defendant's potential or lack of potential for rehabilitation or treatment. Tenn. Code Ann. § 40-35-210 (2003); State v. Taylor, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The party challenging a sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401(d), Sentencing Comm'n Cmts.

In the case under submission, we conclude that there is ample evidence that the trial court considered the sentencing principles and all relevant facts and circumstances. Therefore, we review its decision de novo with a presumption of correctness. Accordingly, so long as the trial court complied with the purposes and procedures of the 1989 Sentencing Act and its findings are supported by the factual record, this Court may not disturb this sentence even if we would have preferred a different result. See Tenn. Code Ann. § 40-35-210, Sentencing Comm'n Cmts; State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

The determination of whether a defendant is entitled to alternative sentencing or probation relies on different burdens of proof. See State v. Boggs, 932 S.W.2d 467, 477 (Tenn. Crim. App. 1996). A defendant is eligible for alternative sentencing if the sentence actually imposed is eight years or less. Tenn. Code Ann. § 40-35-303(a) (2003). A defendant who is a standard offender convicted of a Class C, D, or E felony is presumed to be a favorable candidate for alternative sentencing options in the absence of evidence to the contrary. Tenn. Code Ann. § 40-35-102(b)(6) (2003). The presumption in favor of alternative sentencing may be overcome by facts contained in the presentence report, evidence presented by the State, the testimony of the accused or a defense witness, or any other source, provided it is made part of the record. State v. Parker, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996).

Conversely, "[p]robation is a privilege or act of grace which may be granted to a defendant

who is eligible and worthy of this largess of law." State v. Dykes, 803 S.W.2d 250, 259 (Tenn. Crim. App. 1990). In determining whether to grant or deny probation, the trial court may consider the following: the circumstances of the offense; the defendant's criminal record; background and social history; the defendant's physical and mental health; the deterrent effect on other criminal activity; and the likelihood that probation is in the best interests of both the public and the defendant. State v. Parker, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996). The Defendant bears the burden of establishing suitability for probation. Tenn. Code Ann. § 40-35-303(b); Ashby, 823 S.W.2d at 169. Sentences involving confinement should be based upon the following considerations:

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

Tenn. Code Ann. § 40-35-103 (2003).

In calculating the sentence for a Class D felony conviction, the presumptive sentence is the statutory minimum for a Range I offender if there are no enhancement or mitigating factors. See Tenn. Code Ann. § 40-35-210 (c). If there are enhancement but no mitigating factors, the trial court may set the sentence above the minimum, but still within the range. Tenn. Code Ann. § 40-35-210(d). A sentence involving both enhancement and mitigating factors requires an assignment of relative weight for the enhancement factors as a means of increasing the sentence. Tenn. Code Ann.§ 40-35-210(e). The sentence must then be reduced within the range by any weight assigned to the mitigating factors present. Tenn. Code Ann. § 40-35-210(e). The sentence range for a Range I offender for a class D felony is not less than two years nor more than four years. Tenn. Code Ann. § 40-35-112(a)(4) (2003).

In this case, the trial court determined that the Defendant had two prior misdemeanor convictions, thus, a history of criminal convictions in addition to those necessary to establish the appropriate range. See Tenn. Code. Ann. § 40-35-114(2). The trial court applied the catch-all mitigating factor based on the incident occurring inside the Defendant's home, but it placed little weight on this factor because the victim had apparently been welcome in the home before the altercation began. See Tenn. Code. Ann. § 40-35-113(13). Thus, the trial court enhanced the Defendant's sentence one year above the presumptive minimum, sentencing the Defendant to three years.

Additionally, the trial court considered the manner of service of the Defendant's sentence. As a standard offender convicted of a Class D felony, the Defendant was entitled to a presumption in favor of alternative sentencing. See Tenn. Code Ann. § 40-35-102(b)(6). The trial court, thus, did not err when it granted the Defendant an alternative sentence of split confinement. The trial

court considered the circumstances surrounding the offense and the Defendant's actions, and admonished the Defendant for the assault, stating, "This was . . . It was something that didn't really have to happen, [Defendant]. There's better ways to do things than either . . . Well, other than assaulting somebody with a deadly weapon, a knife. He was assaulted. He was injured, and I think it could be said was seriously injured." In our view, a sentence of sixty days in jail followed by two years and ten months of supervised probation is a sentence that complies with purposes of the 1989 Sentencing Act and is certainly supported by the factual record. Therefore, we will not disturb the sentence imposed by the trial court in this case.

Finally, the Defendant argues that the trial court improperly sentenced him in light of the United States Supreme Court decision in Blakely v. Washington, 542 U.S. 296 (2004). Recently, our Supreme Court concluded that Blakely neither announces a new rule of constitutional law nor invalidates Tennessee's sentencing scheme, by which a trial court is permitted, rather than required, to enhance a sentence within the statutory range based on its finding of relevant enhancement factors. State v. Gomez, 163 S.W.3d 632 (Tenn. 2005). Accordingly, the Defendant is not entitled to the relief he seeks.

### III. Conclusion

In accordance with the foregoing reasoning and authorities, we affirm the Defendant's conviction and sentence.

_____
ROBERT W. WEDEMEYER, JUDGE